# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 25-5150** **September Term, 2024**

1:25-cv-00966-RCL

**Filed On:** May 7, 2025

Middle East Broadcasting Networks, Inc.,

    Appellee

  v.

United States of America, et al.,

    Appellants

**No. 25-5151**

1:25-cv-00907-RCL

Radio Free Asia,

    Appellee

  v.

United States of America, et al.,

    Appellants

**No. 25-5150**                  **September Term, 2024**

**No. 25-5158**

1:25-cv-00799-RCL

RFE/RL, Inc.,

        Appellee

     v.

Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, et al.,

        Appellants

**BEFORE:**    Srinivasan, Chief Judge, and Henderson*, Millett, Pillard, Wilkins, Katsas*, Rao*, Walker*, Childs, Pan, and Garcia, Circuit Judges

## O R D E R

      Upon consideration of the emergency petition for rehearing en banc in Nos. 25-5150 and 25-5151, which requests en banc reconsideration and vacatur of the court's May 3, 2025 order entered in Nos. 25-5144, 25-5145, 25-5150, and 25-5151 granting the government's motions for stay pending appeal in those cases, and the response thereto; the emergency petition for initial hearing en banc in No. 25-5158, which the court construes as a petition for rehearing en banc requesting en banc reconsideration and vacatur of the court's May 7, 2025 order entered in No. 25-5158 granting the government's motion for stay pending appeal in that case, and the response thereto; and the Rule 28(j) letter in No. 25-5158, it is

      **ORDERED**, on the court's own motion, that the following parts of the court's May 3, 2025 order in Nos. 25-5144, 25-5145, 25-5150, and 25-5151 be administratively stayed pending further order of the court:

      In No. 25-5144, staying provision (2) of the district court's preliminary injunction filed April 22, 2025;

      In No. 25-5150, staying the district court's preliminary injunction filed April 25, 2025;

In No. 25-5151, staying the district court's preliminary injunction filed April 25, 2025.  It is

**FURTHER ORDERED,** on the court's own motion, that the court's May 7, 2025 order entered in No. 25-5158 be administratively stayed pending further order of the court.

The purpose of this administrative stay is to give the court sufficient opportunity to consider the emergency petitions and should not be construed in any way as a ruling on the merits of those petitions.  See D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024).

**Per Curiam**

        **FOR THE COURT:**
        Clifton B. Cislak, Clerk

BY:  /s/
      Elbert Lestrade
      Deputy Clerk

*Circuit Judges Henderson, Katsas, Rao, and Walker dissent from this order.  Separate dissenting statements of Circuit Judges Katsas and Rao are attached.  Circuit Judges Henderson, Katsas, and Walker join in the statement of Circuit Judge Rao.  Circuit Judges Rao and Walker join in the statement of Circuit Judge Katsas.

KATSAS, *Circuit Judge*, dissenting: Judge Rao's dissent, which I join, explains the equitable and procedural considerations cutting against the putative administrative stay entered by the *en banc* Court, which effectively requires the government to pay out over $25 million in disputed grants. I write separately to explain another consideration cutting strongly in the same direction: The government is likely to succeed on the merits of the underlying appeals.

I

The United States Agency for Global Media oversees six federally funded broadcast networks. Three of them—Radio Free Asia, Middle East Broadcasting Networks, and Radio Free Europe/Radio Liberty—operate as private, non-profit corporations. Through appropriations, Congress has allocated specific funding for these networks, which USAGM disburses through grant agreements. *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043. In response, USAGM terminated grant agreements with RFA, MBN, and RFE/RL. Parties affected by the downsizing filed several lawsuits in our district court to stop it. In one of these lawsuits, the district court granted a preliminary injunction requiring USAGM to restore its FY 2025 grants with RFA and MBN. *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *18 (D.D.C. Apr. 22, 2025). The court entered the same relief in separate lawsuits filed by RFA and MBN. *Radio Free Asia v. United States*, No. 25-cv-907, 2025 WL 1291342, at *1 (D.D.C. Apr. 25, 2025) (consolidated with MBN lawsuit). In the suit brought by

RFE/RL, after USAGM terminated the FY 2025 agreement, the district court ordered USAGM to enter a successor agreement on the same terms as the predecessors and to disburse funds to RFE/RL consistent with its terms. *RFE/RL v. Lake*, No. 25-cv-799, 2025 WL 1232863, at *10 (D.D.C. Apr. 29, 2025).

The government appealed all these orders and sought stays pending appeal. On May 3, a motions panel of this Court granted stays in the *Widakuswara*, *RFA*, and *MBN* appeals. On May 7, applying reasoning from that stay order, the same panel granted a further stay in the *RFE/RL* appeal. RFA, MBN, and RFE/RL sought *en banc* review of these stays. The *en banc* Court now grants a putative administrative stay of both stay orders. That action effectively requires the government to pay out over $25 million in disputed April grant funds.

Because the putative administrative stay effectively decides the merits regarding the disputed April grant funds, it should rest on the traditional stay factors, which include likelihood of success on the merits. *See Nken v. Holder*, 556 U.S. 418, 425–26 (2009).

II

The RFA, MBN, and RFE/RL appeals turn on whether the district court had jurisdiction to consider their claims. In my view, it likely did not.

This question implicates the line between (1) statutory claims against the government reviewable in district court through the Administrative Procedure Act and (2) contract claims against the government reviewable only in the Court of Federal Claims through the Tucker Act. The APA waives the federal government's sovereign immunity for claims "seeking relief other than money damages," but it withdraws the waiver to the extent that "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5

U.S.C. § 702. The Tucker Act waives sovereign immunity by giving the Court of Federal Claims jurisdiction over claims against the United States "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). For such contract claims, the Tucker Act is exclusive, displacing claims that might otherwise fall within the scope of the APA waiver. *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). To decide whether a claim is contractual for Tucker Act purposes, we consider both the "source of the rights upon which the plaintiff bases its claims" and the "type of relief sought." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

These appeals raise the question of how those principles apply where Congress has allocated appropriated funds to specific recipients, but mandated that the funds be distributed through grant agreements. On the one hand, the governing appropriations statute provides that specific sums of money "shall be allocated" to specific grantees, including RFA, MBN, and RFE/RL. Appropriations Act of 2024, 138 Stat. at 735. According to the networks, that gives them a *statutory* entitlement to receive the appropriated and allocated funds, independent of and antecedent to the terms of any particular grant agreement that may serve as a vehicle for distributing the allocated funds to the statutory beneficiaries. On the other hand, Congress required the funds to be distributed to grantees through *contracts*. It permitted USAGM to "make and supervise grants and cooperative agreements" with the networks, without authorizing any other kind of distribution mechanism. 22 U.S.C. § 6204(a)(5). Furthermore, it provided that grants to RFA "shall be made pursuant to a grant agreement" imposing binding terms on RFA. *Id.* § 6208(c)(5). Likewise, it provided that grants to RFE/RL "shall only be made in compliance with a grant agreement" imposing binding terms on RFE/RL. *Id.* § 6207(g). Thus, in the grant agreements at issue, USAGM promised to pay to the grantee

its allotted share of appropriated funds. *See, e.g.*, Grant Agreement Between the U.S. Agency for Global Media and Radio Free Asia Art. 1.a (Jan. 15, 2025). And in return, each grantee promised to meet various program requirements as set forth in the grant itself and the underlying statute. *See*, *e.g.*, *id.* Arts 1.b, II–XIV. These agreements, reflecting a bargained-for exchange of promises, create government contracts for Tucker Act purposes. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338–39 (Fed. Cir. 2021). Under *Megapulse*, the Tucker Act plainly would cover any claims seeking to enforce the government's contractual promise to pay the allocated funds, which would render the APA waiver inapplicable.

In essence, the networks contend that while they could seek to enforce the contractual promises to pay, they need not do so because the appropriation statute itself entitles them to receive the appropriated funds as allotted. The networks invoke the principle that agencies "must follow statutory *mandates* so long as there is appropriated money available" for doing so. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *see Train v. City of New York*, 420 U.S. 35, 41–43 & n.9 (1975) (enforcing statutory mandate to "allocate" or "allot" appropriated funds). But appropriations merely provide budget authority for agencies to incur "financial obligations" for specified purposes; to the extent they are mandatory, they compel the agency not necessarily to disburse funds right away, but only to form enforceable contractual or other commitments for disbursing them. GAO, Principles of Federal Appropriations Law Ch. 2, at 2–1 (4th ed. 2016 revision) ("Budget Authority: Authority to Obligate"); *see Train*, 420 U.S. at 46 (rejecting asserted agency "power to withhold funds from allotment *and obligation*") (emphasis added); *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 308 (2020) ("The Government may incur an obligation by contract or by statute"); *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (when appropriation lapses,

"unobligated funds revert back into the general treasury"). Here, the statute requires appropriated funds to be "allocated" pursuant to a statutory formula. Appropriations Act of 2024, 138 Stat. at 735. Assume this means that *all* of the appropriated funds must be so "allocated," as the networks contend. In *RFA* and *MBN*, the agency satisfied this statutory duty when it obligated all the appropriated funds in the FY 2025 grant agreements, which created the contractual obligations to disburse the funds as required by the agreements. And in *RFE/RL*, the agency would satisfy this statutory duty by entering a successor agreement obligating the funds at issue. So, while the statutes invoked by the networks would support jurisdiction over APA claims to *obligate* the disputed funds through grant agreements, they could not support jurisdiction over claims for *payment* under the ensuing contracts. For this reason, the motions panel concluded that the government was likely to succeed on its contention that the Tucker Act barred the district court from ordering USAGM to pay the disputed sums to the networks.

The networks object that this analysis treads too much into the merits of their underlying claims, as opposed to the jurisdiction of the district court to hear them. But the stay orders did not decide the merits of any contract claim for breach of the relevant grant agreements. And they assumed, but did not decide, that the networks could have brought an APA claim to enforce the statutory command that the "appropriated" funds had to be "allocated" consistent with a statutory formula. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *4 (D.C. Cir. May 3, 2025). The panel merely concluded that, under the appropriations principles set forth above, no such claim would support the remedy sought by the networks and ordered by the district court—an injunction compelling the government to disburse all of the allotted funds to the networks. *See id.* And because any such injunction would in substance compel specific performance of the grant agreements, it would

involve what *Megapulse* described as a "disguised contract action" covered by the Tucker Act. *See* 672 F.2d at 967–68. In any event, nothing of substance turns on whether the bottom line here is packaged as a conclusion that (1) the appropriation statute does not create an entitlement to receive money (thereby defeating plaintiffs' claims on the merits) or (2) the monetary relief ordered necessarily involves enforcement of the grant agreements (thereby depriving the district court of jurisdiction over the claims). Finally, there is nothing untoward with examining the relevant statutory scheme—involving allotted appropriations distributed through contractual grant agreements—to assess the substance of the claims at issue. To the contrary, the proper application of *Megapulse* turns on substance, not labels—*i.e.*, whether the claim at issue is contractual "at its essence." *See id.* at 967. Making that assessment does not involve an impermissible consideration of merits issues as opposed to jurisdictional ones.

The networks also claim support from *Bowen v. Massachusetts*, 487 U.S. 879 (1988). In *Bowen*, the Supreme Court held that specific monetary relief, as opposed to substitutionary monetary relief, does not involve "money damages" within the meaning of section 702. *See id.* at 893–96. In other words, if a plaintiff seeks to enforce an alleged statutory entitlement to money, the claim involves "relief other than money damages" for APA purposes. *See id.* That holding has no relevance here. As explained above, the Tucker Act does not bar application of section 702 on the ground that contract claims seek money damages; instead, it does so by impliedly forbidding the award of contract-like remedies on disguised contract claims—including remedies that amount to specific performance. *See Transohio Savings Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("*Bowen* did not involve a contract and it did not address the 'impliedly forbids' limitation on the APA's waiver of sovereign immunity"), *abrogated on other grounds as*

*recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985) (Tucker Act bars awards of specific performance); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985) (same). The networks also invoke *Bowen*'s further holding that relief in the Court of Federal Claims is not always an "adequate" remedy to foreclose APA review under 5 U.S.C. § 704. That holding is also inapplicable to these cases, which turn on what counts as "impliedly forbid[ding]" relief within the meaning of section 702, not what counts as an "adequate" alternative under section 704.

Beyond *Bowen*, the networks primarily invoke *Maryland Department of Human Resources v. HHS*, 763 F.2d 1441 (D.C. Cir. 1985), which involved block-grants to States under Title XX of the Social Security Act. *See id.* at 1443. But we specifically held that the disallowance of reimbursements at issue there was not contractual within the meaning of the Tucker Act, and we thus had no occasion to consider "the preclusive effects of the Tucker Act" on the APA sovereign-immunity waiver. *Id.* at 1449. Here, in contrast, the grant agreements clearly constitute government contracts for Tucker Act purposes, *see Columbus Reg'l Hosp.*, 990 F.3d at 1338–39, and the networks do not contend otherwise.

The networks also invoke Federal Circuit precedent, but it cuts against their position as well. The networks highlight *National Center for Manufacturing Sciences v. United States*, 114 F.3d 196 (Fed. Cir. 1997) (*NCMS*), which held that the APA, not the Tucker Act, governed claims that a statute required "allotted" funds to be "distributed" to the plaintiffs. *See id.* at 198. However, the claim in that case was that the allotted funds should be "obligated" through the formation of a new grant agreement. *See id.* at 202. Later, the Federal Circuit confirmed that *NCMS* had involved a claim for access to

"appropriated but unobligated funds"—which would have required the agency "to expand [its] existing contractual relationship or to create a new one." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1369 (Fed. Cir. 2021). *NCMS* is thus inapposite to the claims of RFA and MBN because USAGM did obligate all of the funds allocated to them by entering into binding grant contracts. As for the claims of RFE/RL, we may assume *arguendo* that the district court had jurisdiction to compel it to form an extended grant agreement obligating more of the allotted funds. Even so, that would not create jurisdiction to then specifically enforce the agreement through an order compelling payment under the agreement. Litigation involving the Lummi Tribe confirms all of this: In those cases, the Federal Circuit recognized APA jurisdiction over suits where tribes claimed a statutory entitlement to "larger … grants" than ones the government had already entered. *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017). At the same time, that Court confirmed Tucker Act jurisdiction over related claims challenging the government's performance under *existing* grants. *See Lummi Tribe of Lummi Rsrv., Wash. v. United States*, 788 F. App'x 717, 720–24 (Fed. Cir. 2019).

Finally, the networks contend that the remedies available in the CFC, which include money damages but not prospective relief to compel specific performance, are not good enough. The extent of remedies available on contract claims against the government is of course a policy choice for Congress. Their limited nature is not, in my view, good reason to strain to recharacterize contract claims as something else.

\* \* \* \*

For these reasons, and those stated by Judge Rao, I respectfully dissent from the grants of the administrative stays.

Rao, *Circuit Judge*, dissenting: When is an administrative stay not an administrative stay? When it forces the government to release over $25 million in grant funds with no hope of recovery, even if the government ultimately prevails on the merits, as it is likely to do here.

The "administrative stay" entered by the en banc majority is highly unusual. The ordinary purpose of an administrative stay is to "freeze legal proceedings until the court can rule on a party's request for expedited relief." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (cleaned up). As the court's order recognizes, an administrative stay does not adjudicate the underlying merits of an appeal, but rather gives "the court sufficient opportunity to consider" the pending emergency motion. Order at 2 (citing D.C. Circuit Handbook of Practice and Internal Procedures 33 (2024)). Yet today's order goes far beyond preserving the status quo. By lifting the panel's stay of the district court's orders, the court forces the government to immediately disburse millions of dollars in grant funds to the plaintiffs. The practical effect of this administrative stay is to decide the plaintiffs are entitled to government funding now.

The majority offers no rationale for this extraordinary exercise of judicial power. In granting a stay pending appeal, the panel held that the district court lacked jurisdiction to restore the grants for two of the plaintiffs; that, on the merits, the district court erroneously ordered the government to enter an agreement with the third plaintiff; and that the government would suffer irreparable harm because it is unlikely to recover the funds once they are disbursed.[1] *See Widakuswara v. Lake*,

---

[1] The district court did not require the plaintiffs to post a bond to ensure the government could be compensated should it ultimately prevail on appeal. *See Widakuswara v. Lake*, No. 1:25-cv-1015, 2025 WL 1166400, at *17 (D.D.C. Apr. 22, 2025).

No. 25-5144, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025); Order, *RFE/RL, Inc. v. Lake*, No. 25-5158 (D.C. Cir. May 7, 2025). The panel reached these conclusions in part based on the Supreme Court's recent stay in *Department of Education v. California*, 145 S. Ct. 966, 968–69 (2025). Today's order offers no explanation as to whether the panel's holding was erroneous. Absent any such justification, it is difficult to see how the plaintiffs are entitled to the millions of taxpayer dollars released by the court's order.

Even if the en banc majority believes the plaintiffs are likely to suffer irreparable injury absent our intervention, the timing of the court's order is mystifying and unsupported by the record. Two of the plaintiffs—Middle East Broadcasting Networks and Radio Free Europe/Radio Liberty—have attested they can survive without government funding until at least the end of May. MBN En Banc Petition at Add. 91–92; RFE/RL En Banc Petition at Add. 31–32. And the third plaintiff—Radio Free Asia—has attested only that it will be forced to terminate most of its employees if it does not receive funding by May 9. RFA Stay Opp. at Add. 1. Radio Free Asia does not explain why this harm will be irreparable beyond vague assertions of "reputational and network impacts." *Id.* at Add. 2; *see Widakuswara*, 2025 WL 1288817, at *5 (finding the plaintiffs "may seek to recover any wrongfully withheld grant funds in the" Court of Federal Claims). For at least two of the plaintiffs, and likely all three, there is no reason for this court to rush out millions of dollars in government funding. By contrast, once the government disburses the grant money, there is no possibility of later recovery because, as the plaintiffs attest, they operate almost entirely on federal funds and therefore will be unable to reimburse the government.

Despite the government's immediate and irreparable harm, not to mention its likelihood of success on the merits, the en

banc court picks a side and effectively orders a multi-million dollar judgment in favor of the plaintiffs. When the plaintiffs requested a decision from this court in time to seek Supreme Court review, the panel issued its stay order on a highly expedited schedule. The en banc court affords no similar grace to the government. Instead, it issues an "administrative stay" forcing the government to pay out the grants, with scant time to seek review from the Supreme Court. This gambit stretches our en banc standards and is an abuse of the court's remedial discretion. I respectfully dissent.